**GARY A. FARRELL**
ATTORNEY AT LAW
40 EXCHANGE PLACE
SUITE 1800
NEW YORK, NEW YORK 10005

Telephone (212) 822-1434
Fax (212) 482-1303
GaryFesq@aol.com
Garyfarrelllaw.com

May 7, 2024

Judge Joan M. Azrack
United States District Court
Eastern District of New York
Brooklyn, New York
*Via ECF*

                                                      Re: <u>U.S.A. v. Kennith Desir</u>
                                                      22-CR-087 (JMA)

Dear Judge Azrack:

      As the Court knows, this defendant was convicted after his guilty plea to count one the indictment, Mail and Wire Fraud Conspiracy was accepted by Magistrate Judge Pollack on May 24, 2023. Sentencing is currently scheduled for May 28, 2024. This letter is written pursuant to Rule 32 of the FRCP to advise the Court of several matters that the defendant will raise at the time of sentencing and to aid in the determination of an appropriate sentence.

      I.      **<u>The Presentence Report</u>**

      The defendant has no factual objections to the information contained in the PSR. The defense appreciates that the Department of Probation filed an addendum to the PSR on January 17, 2024, which noted that since the defendant has zero criminal history points, and since he is otherwise eligible, his offense level should be reduced by two levels pursuant to USSG §4C1.1. The addendum also noted that the Government suggested that based upon all eleven defendants having pled guilty in a timely manner, the defendant should receive a 2-level global plea reduction. Should the Court grant these reductions, the total offense level would be 18 and the guideline imprisonment range would be 27-33 months. Addendum to PSR at p. 2.

1

## II.     Loss (U.S.S.G § 2B1.1(b)(1)), Relevant Conduct (U.S.S.G § 1B1.3), and 'Jointly Undertaken Criminal Activity.'[1]

As a general application principle of the Guidelines, act and omissions attributable to a defendant under Relevant Conduct are not only those that are carried out by the defendant himself, but also may include those carried out by others. Relevant Conduct includes "acts and omissions committed, aided, abetted," or otherwise caused by the defendant, U.S.S.G § 1B1.3(a)(1)(A), as well as acts and omissions performed by others that were within the scope and in furtherance of criminal activity jointly undertaken by the defendant that was reasonably foreseeable to the defendant. U.S.S.G § 1B1.3(a)(1)(B).

The case law and guideline application notes make clear that foreseeable jointly undertaken criminal activity under § 1B1.3(a)(1)(B) is not coterminous with the conspiracy as a whole. "[T]he scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy." *United States v. Studley*, 47 F.3d 569, 574 (2d. Cir. 1995) (citing U.S.S.G. § 1B1.3 Applic. Note 2 (1993)). *See also United States v. Khandrius*, 613 Fed.Appx. 4, 7 (2d Cir. 2015) ("The scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy") (citing *United States v. Getto*, 729 F.3d 221, 234 n. 11 (2d Cir. 2013) (internal quotation and punctuation marks omitted); *United States v. Johnson*, 98-CR-420 JG, 2012 WL 4815695, at *3 (EDNY Oct. 10, 2012) ("Shared membership in a conspiracy [by itself] is not enough to hold the defendant accountable for all acts taken by the other conspirators").

Rather, there should be a separate analysis determining which criminal acts within the greater conspiracy were jointly agreed to and undertaken by each defendant. "[T]he court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Studley*, 47 F.3d at 574 (quoting U.S.S.G. § 1B1.3 Applic. Note 2 (1993)). "[T]he burden rests with the government to establish, by a preponderance of the evidence, the scope of the defendant's agreement." *Khandrius*, 613 Fed.Appx. at 8 (citing *Studley,* 47 F.3d at 574, 576). *See also United States v. Archer*, 671 F3d 149, 161 (2d Cir. 2011) ("As to the facts that support the application of a Guideline, the burden of proving such facts is on the government.") Only upon a finding of jointly undertaken criminal activity, may the court proceed to the next prong of making a "particularized finding as to whether the activity was foreseeable to the defendant." *Studley*, 47 F.3d at 574. In other words, if no jointly undertaken criminal activity is found, the court does not proceed to the question of foreseeability. *Id.* ("This determination, as it goes to [jointly undertaken criminal activity,] must be made before the issue of foreseeability, prong two, is reached.") As a result of all this, "'relevant conduct is not necessarily the same for every participant' in a conspiracy." *Johnson*, 2012 WL 4815695, at *3 (citing *Studley*, 47 F.3d at 574).

---

[1] The defendant is not challenging the stipulated guidelines, nor the amount of the fraud, as this is a condition of the plea agreement for which the Government graciously did not insist upon a plea to an Aggravated Identity Theft count. These arguments, which we initially raised when the Government sought to hold the defendants responsible for more than 9.5 million in loses, are being raised here *solely* as mitigating evidence with respect to Desir's particular involvement and role in the conspiracy.

Primary factors to look to in determining whether there was jointly undertaken criminal activity are "whether the participants pool[ed] their profits and resources, or whether they work[ed] independently," and whether the defendant's success was independent of the other participants success or "directly tied to the activities of the other[s]." *Studley*, 47 F.3d at 575. To that end, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* at 575 (citing U.S.S.G. § 1B1.3 Applic. Note 2 (1993)). On the other hand, mere "'knowledge of another participant's criminal acts,' nor 'aware[ness] of the scope of the overall operation' alone is enough to deem the defendant responsible for the acts of co-conspirators." *United States v. Khandrius*, 613 Fed.Appx. at 7 (citing *Studley*, 47 F.3d at 575.) As pointed out in *Studley*, the Guideline application note provides a clear illustration:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them.

47 F.3d at 575 (quoting then U.S.S.G. § 1B1.3 Applic. Note 2 (1993); Current Applic. Note 4(c)(vi)). *See also Stinson v. United States*, 508 U.S. 36, 45 (1993) (The Commission's commentary "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.")

Likewise, for the defendant in *Studley*, 47 F.3d 569, the district court's calculation based on the entire loss caused by the wider conspiracy could not be upheld. There, the defendant was a telemarketer employed in a scheme to fraudulently solicit loan application fees. *Id.* at 571. While working for the scheme, the defendant sat in the same room and shared a phone system with other telemarketers employed by the same office, whom he knew were also performing the exact same type of fraud. *Id.* at 572. However, the defendant "was paid on a pure commission basis" based his own telemarketing and he did not receive any "of the profits of the overall operation." *Id.* at 576. In other words, he "had no interest in the success of the operation as a whole." *Id.* Based on this, the appellate court held it was error to calculate the defendant's sentencing guidelines based on the entire amount defrauded by all the telemarketers working at that office. *Id.* The court decided that, since there was no jointly undertaken criminal activity by that defendant, his loss calculation could only be based on his own fraudulent solicitations alone. *Id.* "[A]mple evidence in the record that [the defendant] was aware that the other sales representatives were defrauding customers, . . . alone is not enough to hold him accountable for the other employees' fraudulent acts." *Id.*; *See also Khandrius*, 613 Fed. Appx. at 7 (Entire amount defrauded by defendant's medical clinic employer could not be counted against him, even where defendant sometimes impersonated the doctor and was aware "that a suspiciously

3

high volume of patients passed through the clinic and that some patients received cash kickbacks.")

In this case, Desir and some of his co-defendants did exchange some information about the fraud that was being perpetrated regarding fictitious unemployment claims. However, there was nothing in the vast Rule 16 disclosure that showed that the co-defendants had any agreement to share proceeds, or otherwise specifically acted together to commit these fraudulent acts, much less that they had knowledge of how much money others in the conspiracy had fraudulently collected. As will be clearly shown below, Desir was one of the youngest and least active of the participants in this conspiracy and the Court should take that into consideration when determining the appropriate sentence. PSR ¶¶s 14, 85.

**18 U.S.C. § 3553(a)**

**1. The History and Characteristics of the Defendant**

Kennith Desir is only 22 years old, and has no prior criminal record whatsoever. PSR ¶¶ 40-45. He was only 18 years old when he became a part of this conspiracy. Kennith was raised by hard-working, middle-class parents who have been married for 36 years and reside in the Canarsie section of Brooklyn. His father has always maintained steady employment, the last ten plus years as a security guard at JFK airport. Kennith's mother likewise was gainfully employed as a home health aide until 2016 when she was injured by a patient. She is seizure prone and must take medication to keep her epilepsy under control. PSR¶ 47.

Kennith's older brother, Ralph, works in the construction field when there is work and he has three sons from various relationships. His sister Gretchen is a high school teacher who has one son from a prior relationship. The Desir family is the definition of "close-knit" as they all reside in the same multi-family, three story house. Notwithstanding these serious charges, his family is unwavering in their support for him. PSR ¶s 48-52.

Sadly, Kennith squandered the opportunity presented to him by the Court and PTS Supervisor Amosa-Ali to participate in the SOS program. From the outset of his enrollment he struggled, always testing positive for marijuana. During his eight months in the program from June of 2022 through February of 2023, despite consistent encouragement from everyone in SOS, Kennith did not live up to the commitment required and he was understandably discharged from the program.

Kennith's closest familial relation is his identical twin brother, Kenell. There is no one who could possibly know the defendant any better. However, unlike Kennith, Kenell is the embodiment of a success story: he graduated with honors from Morehouse College, he is employed by Citi Group as an analyst in their investment bank and global spread products business and he holds Series 7, 63 and SIE licenses. Additionally, he has been accepted by Columbia Business School where he plans to obtain an MBA and a law degree. In a letter to the Court, Kenell lovingly described his brother as a passionate athlete and a role model to their nephews who idolize him:

4

> As early as 5 Kennith started doing pushups and began playing football at the age of 6. . . This love grew into a passion and a drive that kept him focused. . . He learned dedication, teamwork, trust, and belief in the commitment to a process. . . Off the field he continued to coach and mentor the next generation of players both at the youth and high school levels. This commitment and grit transcended into all aspects of his life, especially as an uncle to our 4 nephews. They view him as a father figure who remained close and involved. They deeply yearned to go to his games and always looked up tot him as a role model. . . To conclude, Kennith like any other human made a mistake. A mistake that cannot be undone, but also does not undo the character and humanity that he possesses. Exhibit A.

Kennith's success as a "student-athlete" was amply corroborated by letters from his high school vice-principal, Sheena Garwood (now principal) and his football coach, Matthew Ciquera (Exhibit B). Principal Garwood noted his accomplishments on the football field, but most of her letter centered on his academic achievements and volunteer work:

> As a proud member of the varsity football team Kennith emphasized the word student. Earning Academic honors by taking Advanced Placement (AP) courses such as AP English Language and Composition. He excelled within these rigorous courses and earned a Regents Diploma. I observed his dedication to others and his community by participating in "Victory Give Back Day" days of community focused on giving back to his community at large. His community service activities focused on Ageism and Homelessness. Exhibit B.

Coach Ciquera described Kennith as a "model citizen in the classroom and on the field". Exhibit B. In their senior year Kennith's team competed for the city championship in a game played at Yankee Stadium. Coach Ciquera described Kennith's dedication and attitude while on his team in glowing terms while also acknowledging the mistakes he made that led to his being charged in this case:

> He regularly attended morning study hall sessions and never missed a practice during his time in the program. He always worked extremely hard and always was very respectful to the entire school staff. I was really disappointed to hear about the poor choices that he made. I spoke with him about it several times and I'm confident that he understands the mistake that he made and is ready to move forward as a productive law-abiding citizen. Exhibit B.

Kennith's older cousin, Jessy Pierre, who works as a Care Manager with families with developmental disabilities, recalled her cousin Kennith as intense, focused and a highly competitive student athlete who was constantly seeking the approval of his parents. Exhibit C. Unfortunately, he did not deal with failure well and was prone to feeling shame while his twin brother and peers were on their way to achieving their goals.

Two friends of Kennith from high school, Faith Foster a flight attendant and part-time certified nursing assistant, and Miana Howard, a recreational coordinator working at asylum shelters, praised Kennith for his loyalty as a friend. They both noted that his success on the

5

football field did not take away from the caring, generous person that they had come to know. Exhibit D.

Stacy Chidyausiku wrote to the Court praising Kennith for the positive influence he has had on her son. She noted that Kennith's "positive influence extends far beyond the basketball court, serving as a role model for young athletes in our community." Exhibit D. She made poignant plea to the Court for leniency for this young man who I am sure she has difficulty reconciling the acts he committed in this case based on the genuinely good things she has observed about him over the years.

Pastor Wayne Edwards wrote on the defendant's behalf to corroborate that Kennith is still capable of showing commitment to do good work. For the last year, Kennith has been attending the *Why Not Now Ministry*, specifically the mentorship program, Warriors Are Rising. Pastor Edwards described the program and Kennith's participation as follows:

> Warriors Are Rising is the mentorship arm of the ministry that builds character, brotherhood, and leadership among young men; equipping and encouraging them to be wise in decision making and empowered spiritually, academically, economically and politically. During our weekly meetings Kennith has been very open and honest regarding the decisions that have placed him in this position. He has been responsive to my mentorship, reflective and is committed to growing as a leader. Exhibit E.

The PSR likewise confirmed that Pretrial Services Supervisor Amosa-Ali assisted Kennith in enrolling in the Young Adult Initiative Program. Kennith completed the seven sessions that focused on career and personal development, civic engagement, wellness, mental health, substance abuse and leadership. He received $500 for successfully completing the program for which he believed was a positive experience. PSR ¶53.[2]

### 2. The Need for the Sentence Imposed

There are several additional factors listed under 18 U.S.C. § 3553(a) (2) that the Court must consider in order to "impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing." Some of these factors have already been addressed and the defense will seek to address the remaining ones in combination with each other.

### 3. Seriousness of the Offense, Respect for the Law, and Just Punishment

The offense of conspiring to commit wire and mail fraud is very serious. The facts of this case are particularly disturbing as this conspiracy took advantage of the world turning upside down due to the COVID-19 pandemic and the defendants were able to defraud the New York State Department of Labor by using stolen personal identification information to submit fraudulent claims for benefits which were then mailed out to the defendants' addresses or directly deposited into their bank accounts. PSR ¶¶s 8-14.

---

[2] Kennith was finally able to obtain gainful employment at Costco's for several months in 2023 as a cashier's assistant (Exhibit F, paystubs). PSR ¶64.

### 4. Deterrence and the Protection of the Public

There is no reason to believe that Mr. Desir will commit any further crimes. As a first-time, non-violent offender with a strong network of family and friends, Mr. Desir poses a very low risk of recidivism.[3] As many of the letters submitted by family and friends have noted, the consequences of this matter have already affected Mr. Desir. Accordingly, the goal of specific deterrence has already been realized and would not be meaningfully advanced by a lengthy sentence of imprisonment. Pastor Edwards and Coach Ciquera, among others in the community, stand ready to support Kennith upon his release from prison.

Additionally, the $522,746 restitution order should suffice for purposes of general deterrence as it represents an amount nearly thirty times more than the defendant profited based upon his participation in this scheme. See United States v. Seemongal, 2012 WL 4049594,*3 (E.D.N.Y.) (Weinstein, J. 2012) (Court imposed time served sentence on defendant with total offense level of 18 on fraud case while noting, "general deterrence is effectuated by the restitution ordered.")

### 5. Section 3553(a) (6): A Lenient Prison Sentence with a Period of Supervised Release will Not Result in Unwarranted Sentencing Disparities

In this case, a significantly below guidelines sentence, with a period of supervised release will not result in unwarranted sentencing disparities. To the contrary, such a sentence would be appropriate considering the sentences that this Court has already imposed on four of Kennith's co-defendants.

Tyrek Clarke has received the most prison time thus far of the four sentenced co-defendants, namely 30 months and a three-year term of post release supervision. However, this sentence was below the 37–46-month guideline range as he was a criminal history category two due to having committed a serious crime involving the sexual abuse of a woman and the discharge of a firearm for which he is serving a state prison sentence. (Government's Sentence Memorandum, ECF # 299, p. 2-3). The amount of the fraud attributable to him was about five thousand dollars less than Desir's, however, he does not have the familial support and educational background that Kennith does.

Kai Heyward who likewise was in criminal history category two which made his guidelines also 37-to-46- months received a substantial downward variance as he received a sentence of 27 months and a three-year term of post-release supervision.

---

[3] See U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12-13 & Ex. 10 (2004); U.S. Sentencing Comm'n, *Recidivism and the "First Offender"* 8 (2004); Shirley R. Klein, et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sentencing Reporter 148, 152 (1995) "[T]he better family ties are maintained[,] the lower the recidivism rate."); U.S. Sentencing Comm'n, Staff Discussion Paper, *Sentencing Options Under the Guidelines* 19 (1996) (acknowledging the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties").

7

Heyward was previously convicted of leading police on a high-speed chase after he was pulled over and crashing his car into parked cars (Government's Sentencing Memorandum, ECF# 291, p. 2). He also was convicted of possessing a loaded handgun after a car stop. By contrast, Kennith has no criminal record whatsoever. Additionally, Heyward's forfeiture attribution was more than $24,000, $7000 more than Desir's.

Christopher Jean-Pierre was sentenced to 25 months by the Court and two years post-release supervision and his guidelines, 27-to-33 months, were the same as the defendant's as he also had no criminal record. However, Jean-Pierre was the second most prolific scammer of the eleven men charged as the Government attributed $131,992 in fraudulent benefit payments to him personally, approximately eight times more than the amount attributed to Desir. There is little question that Jean-Pierre and Stephan Dorminvil were the architects of this scheme and that they shared their knowledge of how to do it with their co-defendants. Finally, Jean-Pierre participated in a video entitled "Trappin" posted on social media wherein the individual rapping boasted, "It was me and Porter (Jean-Pierre), we was huggin the block, Unemployment got us workin' a lot." (Government's Sentencing Memorandum, ECF# 276, p. 2-3).

Romean Brown was sentenced to 22 months and two years post release supervision by the Court as he fell into the same adjusted guideline range as Desir, as he also had no prior criminal history points. Brown was arrested in Los Angeles on February 17, 2022, and an executed search warrant revealed that he was in possession of property showing that he was in the process of perpetrating this same unemployment benefits scam in California (Government's Sentencing Memorandum, ECF# 250, p. 2). The amount of loss that Brown was responsible for was approximately $15,000, slightly less than Desir's. Brown, like Desir, was given the opportunity to participate in SOS the program but he did not last nearly as long due to serious compliance issues. He was remanded on October 20, 2022. Notwithstanding Brown's profoundly negative adjustment to pre-trial supervision that caused him to be remanded, he nonetheless received a below guidelines sentence.

All four of the above co-defendants received downward variances from the Court, ranging from a high of 10 months (Heyward) to a low of 2 months (Jean-Pierre). Kennith Desir should be given a bigger downward variance than any of these four young men. He was only 18 when he joined the conspiracy, he had no prior criminal record whatsoever, and he was toward the bottom of the pack in terms of fraudulent claims he personally collected. Although he was discharged from SOS, he achieved some modicum of success by participating in Pastor Edwards mentorship program, completing the young adult initiative program, working at Costco for several months and residing with his family without any major incidents while on a strict curfew. Kennith Desir will have, unlike some of his co-defendants, a strong network of family support to return to after serving any sentenced imposed by the Court, whereas some of these young men will not. For all these reasons, the Court should impose a significantly more lenient sentence on Kennith Desir.

### III. Recommendation

The Court understands the Supreme Court and the Second Circuit have held that, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008); see also Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558; Rita v. United States, 551 U.S. 338 (2007). When arriving at the proper sentence the court may not presume the Guidelines sentence is reasonable, but "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189.

The Probation Department has recommended a sentence of one year and one day with two years of post-release supervision and several special conditions of PRS. Notably, this recommendation was made on August 23, 2023, when the adjusted guidelines were 33-to-41 months, six months more than they are presently.

For all the above reasons, the defense respectfully requests that the Court significantly deviate from the guidelines range and impose a very lenient prison sentence, and a period of post-release supervision not to exceed the two-year period that similarly situated co-defendants have seen sentenced to serve.[4]

Respectfully submitted,

Gary Farrell
Attorney for Kennith Desir

cc: AUSA Michael Gibaldi (via ECF and email)
    AUSA Robert Polemeni (via ECF and email)
    Probation Officer Gregory Giblin (via email)

---

[4] The defense does not object to the proposed special conditions of probation as they are reasonably related to the crimes of conviction or address a clear need of the defendant such as substance abuse counseling.